UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

ASHLEY FURNITURE INDUSTRIES, INC.,

           Plaintiff,            Civil File No. 07-C-0230-C
                                                   **(Trial by Jury Demanded)**

v.

LIFESTYLE ENTERPRISE, INC.,

           Defendant.

**DEFENDANT LIFESTYLE ENTERPRISE, INC.'S REPLY
MEMORANDUM OF LAW IN SUPPORT OF MOTIONS IN LIMINE**

Defendant Lifestyle Enterprise, Inc. ("Lifestyle"), by its attorneys Lathrop & Clark LLP, hereby submits the following reply memorandum of law in support of its motions in limine.

**I.    Ashley's Claim For Price Erosion Damages Should Not Be Presented To The Jury. (Lifestyle's Motion in Limine No. 1).**

Ashley erroneously contends that Lifestyle's motion in limine to exclude Ashley's claim for price erosion damages is an improper and untimely summary judgment motion. As Ashley correctly points out, the deadline for dispositive motions in this case was November 30, 2007. However, Ashley did not submit its expert's report on damages until nearly a month later, on December 21, 2007. It was not until that date that Lifestyle first learned Ashley intended to seek damages for price erosion; Ashley had not previously stated in discovery responses that its claim for damages included price erosion

1

damages. Therefore, Lifestyle could not have moved to exclude Ashley's claim for price erosion damages prior to the November 30, 2007, deadline for dispositive motions.

Although Lifestyle generally agrees with Ashley's statement of the law regarding proof of price erosion damages, the evidence Ashley contends it will be able to present is insufficient to support its claim for price erosion damages. For example, Ashley uses the prior selling price of its panel beds as the "benchmark" price for calculating price erosion damages, but fails to account for fluctuations in its sales even before Lifestyle entered the market with the accused products. Sales of Ashley's South Shore beds, which were introduced prior to its North Shore beds, were already declining. Moreover, Ashley's expert, Mr. Cordray, admits that even with the price reduction, actual sales declined in July 2007, contrary to his projections, but he fails to indicate why. (Updated Cordray Report at pp. 2-3).

Ashley has insufficient evidence that it would have been able to maintain its sales at the higher price in the absence of Lifestyle's introduction of the accused products. In *Brooktree Corp. v. Advanced Micro Devices*, a case cited by Ashley, the patentee calculated its "benchmark" price based on its selling price before the accused infringer entered the market, *but accounted for the amount it would have had to reduce its price to maintain sales even in the absence of the infringing products.* 977 F.2d 1555, 1579-80 (Fed. Cir. 1992). In that case, the patentee reduced its price by 30% in response to competition from the infringer, but recognized that it would have had to reduce its price by approximately 10% per year to maintain its sales even in the absence of infringement. *Id.* at 1579. Ashley, however, has no evidence of the amount it would have had to reduce

2

its prices in the absence of competition from Lifestyle in order to maintain sales, or of the amount by which sales volumes would have dropped in the absence of a price reduction. Thus, Ashley invites the jury to speculate.

Also notably absent from the evidence Ashley will be able to present is any evidence of the appropriateness of its price reduction on the panel beds. *See* Wanek depo. 3-12-08 at pp. 8-9, 10, 20, 23, 28. Contrary to Ashley's assertions, *Tel-Lock, Inc. v. Thomson Consumer Electronics* is *directly* on point. Although Ashley presented expert testimony (unlike the plaintiff in *Tel-Lock*), it has *not* presented testimony or other evidence, expert or otherwise, as to the reasonableness of or basis for the specific price reduction. 2005 U.S. Dist. LEXIS 7224, *15 (N.D. Ill. 2005). Rather, Ashley's expert *assumed* that the chosen price reduction was appropriate, and used that price reduction to calculate damages. Again, absent economic evidence of the appropriateness of the price reduction, Ashley is incapable of satisfying its burden of proof, and therefore its claim for price reduction damages should not be presented to the jury.

In addition, Ashley's unexplained change to its methodology used for calculating sales projections after July, 2007 (and after the deadline for supplementation of expert reports, and the discovery deadline), despite having previously stated that its previous projections would continue through March, 2008, is further evidence that even Ashley (or at least its expert) recognized flaws in its sales forecasts. *See* Cordray depo. at pp. 72-75.

Furthermore, contrary to Ashley's assertions, it is clear from its expert's report that Ashley did not take into account the effect the higher prices would have had on Ashley's sales of panel beds. *See* Bero Report, p. 41. Put another way, Ashley ignores the concept

3

of price elasticity. Rather, Ashley's expert essentially calculated the difference in selling price before and after the price reduction, multiplied by the projected sales volume (which, as previously explained, itself was flawed), thus assuming that Ashley would have captured all of its sales even at the higher price. This is contrary to the law of demand. *See Crystal Semiconductor Corp. v. Tri-Tech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1357 (Fed. Cir. 2001). Ashley's contention that "Table 3 from the Cordray report demonstrates that Ashley's sales would have been lower had it not lowered its prices" (Pl. Br. at p. 4) is without basis. *See* Bero Report, p. 41. Nothing in Table 3 indicates the amount sales would have declined had the price remained the same.

Ashley's contention that the North Shore and South Shore panel beds are the same product, and not different designs (Pl. Br. at p. 4), likewise is erroneous. Although both beds incorporate the same carving detail, and were both found to be the commercial embodiments of the panel bed patent for purposes of the summary judgment motions, the North Shore and South Shore lines have drastically different finish colors. In fact, Ashley admitted that it first introduced its South Shore (light finish) line, and later added the North Shore (dark finish) line to broaden the appeal of the design, as the light and dark finishes primarily appeal to consumers in different parts of the country. (Hinrichs depo. at pp. 50-51). Ashley further testified that it did not believe the North Shore (dark) product line competed with the South Shore (light) product line; the two had different appeal. *Id.* Therefore, by Ashley's own admission, since Lifestyle's accused products were only produced in the dark finish, Lifestyle's dark-finish products only would have competed with Ashley's North Shore line, but not its South Shore line. Accordingly, it

4

would have been appropriate to use sales of Ashley's South Shore panel beds (which were already decreasing, even though they faced no competition from Lifestyle) as the "benchmark market" for calculating sales of Ashley's North Shore panel beds. Generally, benchmark products are those not subject to infringement, which therefore provide an inference of what would have happened in the market "but for" the infringement, *i.e.*, a reconstruction of the market. *See Crystal Semiconductor Corp.*, 246 F.3d at 1355.

Although Ashley is correct that causation of price erosion damages, and the amount of such damages, generally is a jury issue, Ashley nonetheless must prove its damages by presenting reliable economic evidence of demand, supply, and price over time. *See Oiness v. Walgreen Co.*, 88 F.3d 1025, 1030 (Fed. Cir. 1996). In the absence of such evidence, the jury will be forced to engage in "rapt speculation." *Id.* Ashley will be unable to present the requisite economic evidence, and therefore should not be permitted to present its claim for price erosion damages to the jury.

Finally, Ashley's contention that this Court should disregard the *Craftsmen Limousine* case because it was brought under the Sherman Act is without basis.[1] The facts of that case, and the proof presented, are quite similar to the present case, and the reasoning is persuasive. The case indicated the importance of addressing "all aspects of the economic reality" in order to adequately prove price erosion damages, which Ashley

---

[1] It is worth noting that the damages in *Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555 (Fed. Cir. 1992), which Ashley cites multiple times, were analyzed under the Semiconductor Chip Protection Act, and not the patent laws. However, to the extent that the requisite proof of price erosion damages is the same, *Craftsmen Limousince, Inc. v. Ford Motor Co.*, like *Brooktree Corp.*, is persuasive.

5

has not done. *See Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 776-777 (8th Cir. 2004).

II. **The Testimony And Opinions Of Robert Anders Lack Reliability And Should Be Excluded. (Lifestyle's Motion in Limine No. 2).**

Lifestyle has presented two primary reasons for excluding Mr. Anders' testimony and opinions, neither of which Ashley adequately addresses in its responsive memorandum. First, Mr. Anders' utilization of his "dominant-subdominant-subordinate" analysis is inappropriate in the context of applying the ordinary observer test.

In assessing the reliability of an expert's testimony, trial courts consider a multitude of factors, including:

(1) whether the expert's technique or theory can be or has been tested — that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability;

(2) whether the technique or theory has been subject to peer review and publication;

(3) the known or potential rate of error of the technique or theory when applied;

(4) the existence and maintenance of standards and controls;

(5) whether the technique or theory has been generally accepted in the scientific community;

(6) whether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying;

(7) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;

(8) whether the expert has adequately accounted for obvious alternative explanations;

(9) whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting; and

(10) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

*See, e.g., Dhillion v. Crown Controls Corp.*, 270 F.3d 865, 869 (7th Cir. 2001); Committee Notes on 2000 Amend. to FRE 702. Even if a proposed expert employs some reliable methodology, the failure to fully elucidate its underlying reasoning compels its exclusion. *See, e.g, Brinkman v. Int'l Truck & Engine Corp.*, 351 F. Supp. 2d 880, 884 (W.D. Wis. 2004) (Crabb, J.) ("Plaintiffs have not shown what reasoning or methodology underlies the expert opinion, making it impossible to decide whether it is scientifically valid and can properly be applied to the facts in dispute.").

Mr. Anders stated that faculty reviewing a student project generally agree on the dominant and subdominant features in a design; however, he also admitted that he conducted no tests or studies to determine whether untrained, ordinary observers (such as the ordinary observer under the *Gorham* test) would agree on the application of his methodology. (Anders depo. at pp. 30, 32). His method is not quantitatively measurable or reproducible. Mr. Anders was unaware of his method being applied by anyone else to determine substantially similarity in a design patent case such as the present one. (Anders depo. at p. 36).

As even Ashley admits, the method "is used routinely by designers." It is taught to students studying design, and used by faculty to critique design. (Anders depo. at p.

7

30). Mr. Anders presented no evidence that the method is intended to be used to describe what an untrained, ordinary consumer sees when viewing and comparing designs of commercial furniture, nor that the method has even been tested for use in such a context.

Mr. Anders explained that the dominant-subdominant-subordinate method is used to determine which features of a design stand out - *i.e.*, which feature is considered "dominant," which is "subdominant," etc. He has never stated that the method is properly used to compare two different designs in order to determine the extent to which the designs are perceived as substantially similar or dissimilar. In comparing the dominant, subdominant, and subordinate features in the Ashley and Lifestyle designs, Mr. Anders did not apply any scientific methods other than his own, subjective opinion, thus invading the province of the jury. Moreover, he has never stated that even if two different designs would be found to have the same dominant, subdominant, and subordinate features, the designs would necessarily be so substantially similar such as to induce an ordinary purchaser to purchase one confusing it for the other (the proper standard under *Gorham v. White*, 81 U.S. 511 (1871)).

Ashley's contention that Mr. Anders' method has never been rejected by a court is unpersuasive. There is no evidence that his method has ever been challenged, and therefore considered by a court. Mr. Anders admitted that his application of the "dominate-subdominant-subordinate" method has never been accepted by a court, either. (Anders depo. at p. 36). Mr. Anders' opinions and testimony regarding the use of the "dominant-subdominant-subordinate" method for determining similarity of the accused and patented designs are untested, unproven, and unreliable, and should be excluded.

8

Second, Mr. Anders' utilization of the "person off of the street" as the ordinary observer is erroneous. The distinction is not merely an exercise in semantics, as Ashley contends (Pl. Br. at p. 7), but a critical and meaningful legal distinction. When applying the *Gorham* ordinary observer test to determine substantially similarity between the accused and patented designs, the proper ordinary observer is the *purchaser* of the items at issue, giving such attention as the *purchaser* of those items would give. *Gorham*, 81 U.S. at 528. Lifestyle recognizes that the Court found that the ordinary observer is the ultimate consumer, and not the intermediary retail buyer. However, a critical distinction remains between the consumer of furniture who is in the market to carefully comparison shop and ultimately invest in bedroom furniture, and a "person off of the street" who may have no need for or interest in viewing and comparing bedroom furniture.

The ultimate consumer, who is actively seeking to purchase bedroom furniture, pays close attention to the details of pieces of furniture, and shops a number of stores, over a significant period of time, often returning to their item of choice several times before purchasing. (Robertson Rebuttal Report on Infringement, pp. 12-13). Even Mr. Anders admits that a person might initially notice certain features, but upon continued viewing of a design, focus on other features. (Anders depo. at pp. 34-35). Therefore, the attention paid by the *ordinary consumer* is quite different than that paid by a "person off of the street" who may happen to view a piece of furniture. *Compare Braun Inc. v. Dynamics Corp.*, 975 F.2d 815, 820 (Fed. Cir. 1992) (consumers purchasing inexpensive hand blenders would pay less attention to the design). There is no foundation for Mr. Anders' use of a "person off of the street" as the ordinary observer when applying the

9

*Gorham* ordinary observer test, and his opinions and testimony applying such a standard should be rejected and not presented to the jury.

### III. The Issue Of Willfulness Should Not Be Presented To The Jury, As Ashley Is Unable To Present Sufficient Evidence To Satisfy Its Burden Of Proving Willfulness. (Lifestyle's Motion in Limine No. 3).

Lifestyle and Ashley appear to agree that the Federal Circuit's new standard for proving willfulness pursuant to *In re Seagate Technology, LLC* has not yet been fully developed. One thing that is unequivocal, however, is that the new *Seagate* standard intended to raise the burden of proving willful infringement. *See* 497 F.3d 1360, 1371 (Fed. Cir. 2007). Case law prior to *Seagate* clearly provided that knowledge of the patent was a prerequisite to a finding of infringement. *See, e.g., NCube Corp. v. Seachange Int'l, Inc.*, 436 F.3d 1317, 1324 (Fed. Cir. 2006) ("Actual notice of another's patent rights triggers an affirmative duty of due care to avoid infringement… Willful infringement in this case hinges on when the defendants had actual knowledge of the plaintiff's patent rights, and their actions after that time). Ashley provided no persuasive authority for its assertion that actual notice was not a *per se* requirement of proving willfulness. In light of *Seagate*'s explicit objective of raising the willfulness standard, actual knowledge of the plaintiff's patent rights must continue as a prerequisite for a finding of willful infringement. The objective recklessness standard, then, must apply to the defendant's conduct after it had actual notice of the patents. Because Ashley cannot present evidence that Lifestyle knew of Ashley's patents, it is incapable of meeting its burden of proving willfulness.

Not only is there no evidence that Lifestyle knew of Ashley's patents, but the undisputed evidence shows that Lifestyle *could not have known* of the patents at the time it first developed and took orders for its products, as Ashley's patents had not yet issued.[2] Therefore, Lifestyle did not stick its head in the sand in an effort to avoid learning of Ashley's patents, as Ashley suggests; even under the objective *Seagate* standard, neither Lifestyle nor anyone else could have known of the patents until they issued in April, 2006. Lifestyle would not even have had constructive notice of the patents until the summer of 2006 at the earliest, when Ashley contends it began marking its products. (Ex. 217).

Moreover, because the *Seagate* standard is an objective standard, "the state of mind of the accused infringer is not relevant to this objective inquiry." *Id.* Therefore, the fact that Lifestyle knew Ashley had sought design patent protection on at least one prior bedroom set is not a proper consideration under *Seagate*.

Ashley also incorrectly asserts, with citation to an older case, that continued infringement after suit is filed is evidence of willfulness. (Pl. Br. at p. 13). *Seagate* expressly eliminated post-suit conduct as a factor when considering willfulness, and held that only pre-suit conduct is relevant when the patentee has failed to seek a preliminary injunction, as in this case. *Id.* at 1374. Ashley did not seek a preliminary injunction, nor did it even send Lifestyle a cease and desist letter. Therefore, contrary to Ashley's

---

[2] Ashley erroneously contends that Lifestyle did not begin selling its products until October 2006, six months after the patents issued. In fact, Lifestyle began taking orders shortly after it introduced its products at the April 2006 market, although there was a delay before it actually delivered the orders. (Noe depo. at pp. 63-64).

11

assertions, the fact that Lifestyle continued to sell its products after the suit was filed, without changing the design, is not evidence of willfulness.

Because Ashley will be unable to present evidence of willfulness sufficient to satisfy the heightened standard under *Seagate*, its willfulness contentions and claim for enhanced damages should not be presented to the jury.

**IV.   Ashley's Commercial Products Should Not Be Presented To The Jury, As Any Relevance Is Outweighed By Prejudice To Lifestyle. (Lifestyle's Motion in Limine No. 4).**

Lifestyle does not contend that Ashley's commercial products are entirely irrelevant to this issues in this case, but rather that any relevance is outweighed by prejudice to Lifestyle. In its responsive memorandum, Ashley contends that its commercial products are relevant in several respects, but does not explain why the products are relevant to such issues. For example, it is unclear (and Ashley does not explain) how presenting its final commercial products shows the design and development of Ashley's products, or even why evidence of its design and development process is relevant to a jury's determination of infringement and damages. *See* Pl. Br. at p. 16. Similarly, it is unclear how Ashley's commercial products are relevant to its marketing and advertising activities, or why Ashley's marketing and advertising practices are relevant to the issues of infringement and damages.

Even assuming that Ashley's commercial products are relevant in certain respects, the prejudice to Lifestyle far outweighs any relevance. As explained in Lifestyle's initial memorandum, Ashley's products contain several significant features, such as size and color, that are not part of its patents. A jury may (perhaps unintentionally) consider

similarities between the Ashley and Lifestyle commercial products that are not part of Ashley's patents, and that are inappropriate considerations in an infringement analysis. A jury instruction will not eliminate the problem; as this Court is surely aware, it is seldom possible to be sure that a jury will entirely ignore matters it has already seen. Therefore, Ashley's commercial products and photographs of its commercial products should be excluded, and the jury should only see the patent drawings.

V. **Robert Cordray's "Updated" Report Should Be Stricken As An Improper Rebuttal Report. (Lifestyle's Motion in Limine No. 5).**

Ashley did not respond to Lifestyle's concerns that Cordray's "Updated" Report was actually an improper rebuttal report directly responding to the report and deposition testimony of Lifestyle's damages expert pointing out the flaws in Mr. Cordray's analysis. Lifestyle explained in detail in its initial memorandum how Mr. Cordray's "Updated" Report went far beyond merely updating his previous tables and calculations with new figures, and will not repeat such facts here. Because the Court never contemplated damages experts submitting rebuttal reports, and because Lifestyle has not had an opportunity to present a rebuttal report from its own damages expert responding to Ashley's rebuttal damages report, the Updated Cordray Report should be excluded.

Moreover, the total damages claimed by Ashley through Mr. Cordray's damages analysis did not include any damages for collateral sales – his report and testimony make this clear. Therefore, such sales should be excluded from Ashley's damages claim.

VI. **Any Relevance Of Documents Suggesting Lifestyle's Foreign Ownership And Manufacturing Source Is Outweighed By Prejudice To Lifestyle. (Lifestyle's Motion in Limine No. 8).**

Lifestyle does not contend that there is no relevance of the documents it seeks to exclude which show or suggest its foreign ownership and manufacturing source, but rather asserts that any relevance is far outweighed by prejudice to Lifestyle. Ashley contends that Lifestyle's foreign ownership and manufacturing location are relevant to show Lifestyle's business model, but does not explain why evidence of Lifestyle's business model is relevant to the issues in this case. For example, the fact that Lifestyle advertises that it ships its products from Asia by the container-load does nothing to demonstrate whether an ordinary observer would be confused by similarities between Lifestyle's products and Ashley's patented designs, nor is it evidence of Ashley's claimed damages. The relevance of such documents, if any, is minimal. In contrast, Lifestyle may be greatly prejudiced if the jury is led to believe that Ashley is a local, family-owned company, while Lifestyle's ownership and manufacturing is based in Asia. Because the prejudice of such information outweighs any relevance, documents suggesting Lifestyle's foreign ownership or manufacturing source should be excluded.

**VII. This Court Should Rule On The Numerous Objections Asserted During The Deposition of Lifestyle's Liability Expert, Sherwood Robertson, And Should Exclude All Testimony That Was Elicited Over Proper Objections. (Lifestyle's Motion in Limine No. 18).**

Ashley mischaracterizes Lifestyle's concerns regarding the deposition testimony of its liability expert, Sherwood Robertson. Lifestyle is not concerned that Mr. Robertson gave what Ashley believes was damaging testimony; rather, Lifestyle is concerned that such testimony was elicited over numerous objections to the form of questions from Ashley's counsel, and objections that the questions were vague, ambiguous, confusing,

and had been asked and answered. For example, Ashley's counsel asked Mr. Robertson whether he believed the accused designs were "substantially similar" to the patented designs, but did not define "substantially similar" according to the *Gorham* standard, which specifically provides that designs are substantially similar *if a purchaser would be induced to purchase one believing it to be the other*. Therefore, Lifestyle requests that the Court rule on the objections asserted at the deposition, and exclude all testimony that was elicited despite proper objections.

Dated this 14th day of April, 2008.

LATHROP & CLARK LLP

By: /s/ Kenneth B. Axe

Kenneth B. Axe
Christopher J. Hussin
Carrie Benedon
740 Regent Street, Suite, 400
P. O. Box 1507
Madison, WI 53701-1507
Telephone: (608) 257-7766
Facsimile: (608) 257-1507

Andrew A. Vanore, III
**BROWN, CRUMP, VANORE & TIERNEY, L.L.P.**
One Bank of America Plaza
421 Fayetteville Street Mall, Suite 1203
Raleigh, NC 27601
Telephone: (919) 835-0909
Facsimile: (919) 835-0915

**ATTORNEYS FOR LIFESTYLE ENTERPRISE, INC.**

L:\clients\LIFEENT\1\Trial\Lifestyle Reply Brief in support of motions in limine 041408.doc